**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STEPHEN POWELL, 1001 L Street NW, Apt. 506, Washington, DC 20001, ) ) ) Plaintiff, ) ) v. ) ) HARVARD UNIVERSITY (a/k/a PRESIDENT ) AND FELLOWS OF HARVARD COLLEGE) ) Massachusetts Hall, Cambridge, MA 02138; ) HARVARD UNIVERSITY JOHN F. KENNEDY ) SCHOOL OF GOVERNMENT, 79 John F. ) Kennedy Street, Cambridge, MA 02138; and ) CHARLES HAIGHT, 24 Blake Field, ) Amherst, MA 01002-2504, ) ) Defendants. ) ) | Case No. _____ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Stephen Powell, by and through his attorneys, brings the following Complaint against Defendants Harvard University (a/k/a President and Fellows of Harvard College), Harvard University John F. Kennedy School of Government, and Charles Haight, and, in support of his Complaint, avers as follows:

**NATURE OF THE ACTION**

1.      Plaintiff Stephen Powell ("Mr. Powell") brings this action against Defendants Harvard University (a/k/a President and Fellows of Harvard College), Harvard University John F. Kennedy School of Government ("HKS"), and Charles Haight (collectively, "Defendants"), in response to Defendants' false and defamatory statements about him that damaged his reputation, and Defendants' intentional invasion of Mr. Powell's privacy by improperly disclosing and disseminating information purportedly related to his financial status.   In addition, because Defendants have recently and for the first time taken the position that Mr. Powell is not a

1

graduate of HKS—more than two decades after he successfully completed all requirements at HKS for his Master in Public Administration ("MPA") degree, and despite repeated affirmations over two decades that he is an HKS graduate—Mr. Powell also asserts claims for promissory estoppel and equitable estoppel to prevent Defendants from denying his status as an HKS graduate who received his MPA degree from HKS.

## PARTIES AND RELEVANT NON-PARTIES

2.     Plaintiff Stephen Powell is a successful and accomplished businessman and investment banker and a graduate of HKS.  Mr. Powell is the founder and managing director of SinoPowell Capital LLC, a company focused on international transactions in mining, energy, real estate, aviation, finance, and logistics.   Prior to founding SinoPowell Capital LLC, Mr. Powell founded HBO Sports and became the first Programming Chief at ESPN.  Mr. Powell holds a Bachelor of Arts degree in Economics from Brown University, a Master of Business Administration ("MBA") from Harvard Business School, and a Master of Public Administration ("MPA") from HKS, which he received in June 1994.  Since graduating from HKS, Mr. Powell has been extensively involved in the HKS alumni community.  He was elected twice as a Representative of the HKS DC Alumni Council and was elected President of the HKS DC Alumni Council in 2015.  Mr. Powell served in that capacity until he was forced from this office following and as a direct result of Defendants' false and defamatory statements about him, as explained herein.

3.     Defendant Harvard University, also known as the President and Fellows of Harvard College ("Harvard University"), is a private educational institution based in Cambridge, Massachusetts.  It was established in 1636 and is the oldest institution of higher education in the United States.  Defendant Harvard University published false and defamatory statements about Mr. Powell, invaded Mr. Powell's privacy by disclosing and disseminating confidential financial

information about Mr. Powell, and has improperly denied Mr. Powell's status as an HKS graduate, as explained herein.

4.      Defendant Harvard University John F. Kennedy School of Government ("Harvard Kennedy School" or "HKS") is a school of Harvard University in Cambridge, Massachusetts. HKS is a public policy and public administration school and offers master's degrees in public policy, public administration, and international development, as well as several doctoral degree and various executive education programs.  Mr. Powell attended HKS from June 1993 to June 1994, and during that time completed all requirements for an MPA degree.   In June 1994, Mr. Powell received his MPA degree from HKS.   Defendant HKS published false and defamatory statements about Mr. Powell, invaded Mr. Powell's privacy by disclosing and disseminating confidential financial information about Mr. Powell, and has improperly denied Mr. Powell's status as an HKS graduate, as explained herein.

5.      Defendant Charles Haight is resident and citizen of the Commonwealth of Massachusetts.  Defendant Haight is the former Senior Associate Dean for Alumni Relations and Resource Development for HKS, a position at HKS and Harvard University that he held from the summer of 2012 until the fall of 2016.  Mr. Haight is currently a Senior Advisor for Alumni Relations and Resource Development for HKS.   Defendant Haight published false and defamatory statements about Mr. Powell, invaded Mr. Powell's privacy by disclosing and disseminating confidential financial information about Mr. Powell, and has improperly denied Mr. Powell's status as an HKS graduate, as explained herein.

6.      Non-Party Elizabeth Nunez ("Liz Nunez" or "Ms. Nunez") is the former Senior Director of Alumni Relations for HKS, a position she held from June 2013 until July 2016. Ms. Nunez is currently the Director of Alumni Leadership at Dartmouth College.

## JURISDICTION AND VENUE

7.       This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332 because the Plaintiff and the Defendants are citizens of different States and the amount in controversy exceeds $75,000.

8.       This Court has personal jurisdiction over Defendants under D.C. Code § 13-423, both under subsection (a)(3) because Defendants acted, directly and by their agents, as to a claim for relief arising from its causing tortious injury in the District of Columbia by an act or omission in the District of Columbia, and under subsection (a)(4) because Defendants acted, directly and by their agents, as to a claim for relief arising from its causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia and Defendants regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

9.       This Court has personal jurisdiction over Defendants—and the exercise of that jurisdiction comports with the Due Process Clause of the United States Constitution—because Defendants expressly aimed and purposefully directed their defamatory statements at Mr. Powell, a District of Columbia resident, and to other persons in the District of Columbia (including officers of the HKS DC Alumni Council in the District of Columbia) knowing that the brunt of the injury would be felt in the District of Columbia.  This Court also has personal jurisdiction over Defendants because Defendants availed themselves of the District of Columbia by maintaining an office in the District at 499 S. Capitol St. SW #405, Washington, DC 20003, by maintaining multiple alumni organizations in the District of Columbia, and by regularly conducting business in the District of Columbia and receiving benefits from that business in the District of Columbia.  Defendants have also availed themselves of the District of Columbia by actively seeking money contributions from citizens of the District of Columbia and routinely, by

their agents, traveling to and from the District of Columbia to recruit students, host events, and solicit and obtain donations.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District and because Defendants are subject to the Court's personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### Mr. Powell Builds A Strong Reputation As A Successful Businessman

11.     Over the past forty-three years, Mr. Powell has built a strong reputation as a successful businessman, investment banker, and leader.

12.     After graduating from Brown University in 1974 with a Bachelor of Arts degree in Economics, Mr. Powell began a successful career in the entertainment industry and received his MBA from Harvard Business School.  Mr. Powell founded HBO Sports and served as the first Programming Chief at ESPN, becoming the youngest person ever to head sports programming at a major television network and the only person to start and lead two such operations.

13.     Drawing on his experience in the entertainment industry, Mr. Powell became an investment banker specializing in media transactions.  Mr. Powell also worked in the Sports Marketing Group at Philip Morris, as a management consultant at Bain & Company, as an investment banker at Grubb & Ellis, and as a commercial banker at the Bankers Trust Company (now Deutsche Bank).  He was also the Managing Director of SEPowell Capital LLC, an investment and advisory practice specializing in media projects, whose clients included national television networks in the United States, United Kingdom, Ireland, and Canada, as well as cable networks, publishers, broadcasters, advertising agencies, and new media companies.

14.     In 1999, Mr. Powell founded and became Managing Director of SinoPowell Capital LLC to focus on international transactions in mining, energy, real estate, aviation, finance, and logistics.  In that role, Mr. Powell has led SinoPowell Capital LLC in transactions in over thirty countries with a combined value in excess of $20 billion.  SinoPowell Capital LLC's clients and partners include private, public, and government entities in the United States and across the world.

### Mr. Powell Attends And Graduates From HKS
### And Receives His MPA Degree

15.     Having already received his MBA, and in order to further his career, in 1993 Mr. Powell applied to HKS and was admitted as a candidate for a Master of Public Administration degree.

16.     Following his acceptance to HKS, Mr. Powell took a year-long leave from his employment to pursue his MPA full-time.  Mr. Powell was a sponsored student of his then-employer, New England Broadcasting, Inc., which paid his HKS tuition in full.

17.     Mr. Powell was a good student at HKS, receiving high marks, being elected a Representative and then elected President of the HKS Student Government, and completing every degree requirement to obtain an MPA.  Mr. Powell received his MPA from HKS in June 1994.

18.     In the decades since Mr. Powell's graduation from HKS, HKS has represented to members of the public that Mr. Powell is an HKS graduate and Mr. Powell has been told by HKS that he is a graduate of HKS, has received alumni correspondence from HKS, and has been actively involved in the HKS alumni community and HKS alumni governance organizations.

**Mr. Powell Becomes And Remains Actively Involved In
The HKS Alumni Community And Serves As President
Of The HKS DC Alumni Council**

19.     Following his graduation from HKS and in the decades since his graduation from HKS, Mr. Powell has been an active member of the HKS alumni community, both in general and, specifically, in the HKS Washington DC alumni community, including through participation and service on the HKS DC Alumni Council.  The Council is a 17-member body that represents the 9,000+ HKS graduates in the Washington DC metropolitan area.  Mr. Powell was elected to the council by those graduates to represent them for two consecutive terms.

20.     In 2015, in order to increase his involvement and give back to HKS and its alumni community, both in general and in the DC area, Mr. Powell ran for—and won—the position of President of the HKS DC Alumni Council.

21.     In 2017, HKS named the HKS DC Alumni Council as "Council of the Year" from amongst its 30+ alumni councils around the world for its performance during 2016, with Mr. Powell serving as Council President for the first half of that year.

22.     During his tenure as Council President, Mr. Powell increased to record levels the number of alumni events held in DC, alumni attendance at events, the Council's bank balance, the Council's mailing list, and the attendance at monthly Council meetings.

23.     Among other contributions during his tenure as President, Mr. Powell marshaled his business background to work with members of the HKS DC Alumni Council to create and develop a website for the HKS DC Alumni Council that would, among other things, enable HKS graduates to better connect with the Council and facilitate Council and alumni activities.  To that end, Mr. Powell and the Council devoted significant time and money to develop a website for the Council that they could also share as a template for other regional HKS Alumni Councils to foster greater involvement and connections among the alumni community.

**Mr. Powell's Meeting With Then-Senior Director**
**Of Alumni Relations Elizabeth Nunez**

24.     Although Mr. Powell had informed then-Senior Director of Alumni Relations for HKS Elizabeth Nunez of his and the DC Alumni Council's efforts to develop the website and had offered to provide the website to Ms. Nunez and HKS to use as a template for other councils' websites, Ms. Nunez and HKS contemporaneously (and without informing Mr. Powell) developed a different website to be available for every Alumni Council chapter, thereby substantially and unnecessarily duplicating efforts and causing the DC Alumni Council to incur significant unnecessary costs.

25.     Mr. Powell was disappointed that Ms. Nunez and HKS had developed a website for every Alumni Council without informing the DC Council when they knew that the DC Council and he were devoting substantial time and incurring significant costs to develop an alumni website on their own that could be shared with other alumni councils.  Thus, Mr. Powell requested to meet with Ms. Nunez during the HKS Reunion Weekend in May 2016, when he was in Cambridge, Massachusetts for meetings with HKS and other Alumni Council leaders.

26.     Mr. Powell and Ms. Nunez met during the HKS Reunion Weekend in May 2016; only Mr. Powell and Ms. Nunez were in attendance at the meeting.  During the meeting, Mr. Powell expressed his disappointment at the duplication of efforts and costs with the website development projects and the lack of communication from Ms. Nunez and HKS with the DC Council and him about the projects.

27.     Mr. Powell remained completely professional during the meeting, but Ms. Nunez inexplicably became upset, cried, and threatened to revoke the HKS DC Alumni Council's charter.

28.     Mr. Powell was surprised and troubled by Ms. Nunez's actions during their meeting, but in an effort to maintain a good working relationship with Ms. Nunez and between HKS and the HKS DC Alumni Council, Mr. Powell sent Ms. Nunez flowers after the meeting as a sign of good will.

29.     On information and belief, Ms. Nunez told then-Senior Associate Dean for Alumni Relations and Resource Development for HKS Charles Haight about her meeting with Mr. Powell and, in so doing, misrepresented many details of the meeting and falsely alleged that Mr. Powell behaved inappropriately during the meeting.

30.     Haight never reached out to ask Mr. Powell about his meeting with Ms. Nunez.

**Defendants Make False And Defamatory Statements About Mr. Powell**

31.     On June 10, 2016, Defendant Haight, acting in his capacity as Senior Advisor and employee of HKS, sent an email to Mr. Powell and three additional persons—Sarah Wald, Wendy Pangburn, and Liz Nunez—in which he made false and defamatory statements about Mr. Powell.

32.     Affirming that he was acting in his official capacity as an officer of HKS and Harvard University, Haight began his email by writing "As a senior officer of HKS responsible for Alumni Relations, I have been asked to reach out to you on two matters of serious concern."

33.     In that email, Defendant Haight first falsely accused Mr. Powell of not being a graduate of HKS.  Haight wrote that "you [Mr. Powell] have a significant outstanding debt from the 1994 academic year in the amount of $22k while you were enrolled in the mid-career MPA program," and wrote that "your degree was not conferred due to this outstanding debt."  Haight further wrote that "[t]his is problematic for the School, and as a matter of policy, you cannot be considered a graduate of Harvard Kennedy School until this is remedied."

34.     These statements are false and defamatory.  Mr. Powell's employer at the time he enrolled at HKS, New England Broadcasting, Inc., paid his tuition in full after he enrolled in HKS's MPA Program.  Mr. Powell successfully completed all requirements for obtaining an MPA from HKS and graduated from HKS and received his MPA degree.

35.     Indeed, HKS has repeatedly recognized Mr. Powell as an HKS graduate over the decades since he graduated, through numerous correspondence and throughout Mr. Powell's significant alumni organization involvement.

36.     In fact, as recently as May 8, 2016—a month before Haight sent his false and defamatory email—Ms. Nunez wrote to Mr. Powell that "we still very much count you as a member of the alumni community and you are still eligible to lead the Council, etc."

37.     In Haight's June 10, 2016 email, he further accused Mr. Powell of improper and unprofessional "interactions with staff," and in particular inappropriate "behavior" during his meeting with Ms. Nunez.  Haight accused Mr. Powell of "berat[ing]" Ms. Nunez and "us[ing] threatening language towards [Ms. Nunez] in a closed room."

38.     Haight expressly emphasized that he was accusing Mr. Powell of inappropriate actions, writing: "I cannot say strongly enough how seriously we take this.  Such behavior toward any member of the Kennedy School community at any time is inappropriate and unacceptable."

39.     Haight continued:

It is of course our expectation that any officer of an HKS Alumni Council comport himself appropriately, and comply with all policies and standards of behavior of HKS.  Incurring debt for classes taken and treating staff disrespectfully are not consistent with the values of HKS.  As such, we have taken the position that you should not serve as an officer of the DC Council.

Given this, we believe it is in everyone's best interests that you should not run for re-election as President of the DC Alumni Council and should not seek elected offices.

40.     These statements are false and defamatory.   Mr. Powell did not behave inappropriately, improperly, unprofessionally, or unacceptably.   Mr. Powell did not "berate[]" Ms. Nunez.  Mr. Powell did not "use[] threatening language towards [Nunez] in a closed room." Mr. Powell did not "treat[] staff disrespectfully" or in a way inconsistent "with the values of HKS."  Mr. Powell did not act in violation of "policies and standards of behavior at HKS."  To the contrary, Mr. Powell has always acted professionally and with composure, including during his meeting with Ms. Nunez, and despite Ms. Nunez's unprofessional behavior during that meeting.

41.     Haight sent his defamatory email from his official HKS/Harvard University email account, and he signed his email "Charlie Haight | Senior Associate Dean | Alumni Relations and Resource Development | Harvard Kennedy School."

42.     Haight never inquired with Mr. Powell about the subjects or substance of his allegations before making them and did not allow Mr. Powell to dispute or explain why those accusations are false.

43.     Upon information and belief, Haight, acting in his official capacity as HKS Senior Associate Dean of Alumni Relations and Resource Development, shared his June 10, 2016 email with additional persons, including Jayme Johnson (Vice President of the HKS DC Alumni Council), Lisa-Joy Zgorski (Treasurer of the HKS DC Alumni Council), and John Haederle (Secretary of the HKS DC Alumni Council).

44.     The fact that Haight shared his email and false and defamatory statements with Mr. Johnson, Ms. Zgorski, and Mr. Haederle is indicated by the fact that they emailed Mr. Powell on June 12, 2016 stating that Haight's accusations had been shared with them.

**Defendants Invade Mr. Powell's Privacy By**
**Disclosing And Disseminating Information Relating To Mr. Powell's Financial Status**

45.     In the June 10, 2016 email, Haight and HKS invaded Mr. Powell's privacy by disclosing confidential information related to Mr. Powell's financial situation.

46.     Despite this sensitive nature of financial information, Haight, acting in his official capacity "[a]s a senior officer of HKS responsible for Alumni Relations," and for and on behalf of HKS, Harvard University, and himself, disclosed Mr. Powell's alleged financial status to persons without Mr. Powell's consent.

47.     Haight, "[a]s a senior officer of HKS responsible for Alumni Relations," disclosed information about Mr. Powell's financial situation by writing in his June 10, 2016 email that "information that we recently received from the Office of Financial Services [indicates] that you [Mr. Powell] have a significant amount of outstanding debt from the 1994 academic year in the amount of $22k while you were enrolled in the mid-career MPA program," and that "[t]heir records indicate that your degree was not conferred due to this outstanding debt."  Haight further disclosed and disseminated financial information about Mr. Powell by sharing the allegations in that email with additional persons, including, at the very least, Jayme Johnson, Lisa-Joy Zgorski, and John Haederle.

48.     Although the financial information in Haight's June 10, 2016 email is false, such financial information is nonetheless personal, confidential, and sensitive in nature.

49.     Mr. Powell had and has an expectation of privacy in financial information about him maintained by his alma mater.  Mr. Powell did not give Defendants permission to disclose information about his alleged educational debt to anyone.

50.     By disclosing this information, Defendants impermissibly invaded Mr. Powell's privacy.

**Defendants' Defamatory Statements And Invasions Of Mr. Powell's Privacy
Cause Significant Harm To Mr. Powell**

51.     Defendants' false and defamatory statements and invasions of Mr. Powell's privacy caused Mr. Powell significant harm and damage.

52.     Mr. Powell has suffered severe reputational harm as a result of Defendants' false and defamatory statements and invasions of Mr. Powell's privacy.   Defendants recklessly portrayed Mr. Powell as a fraud, a debtor, and a threatening, unprofessional person.

53.     Mr. Powell's reputational harm is presumed because Defendants' statements about him are defamatory *per se* because those statements—accusing Mr. Powell of falsely and fraudulently holding himself out as an HKS graduate, "berat[ing]" Ms. Nunez, "us[ing] threatening language towards [Ms. Nunez] in a closed room," engaging in "inappropriate ... behavior," and acting in violation of "policies and standards of behavior at HKS"—accuse Mr. Powell of engaging in conduct incompatible with his profession.

54.     Reflecting some of the initial damage that Defendants' false and defamatory statements and invasions of Mr. Powell's privacy caused Mr. Powell, on June 13, 2016, Mr. Johnson, Ms. Zgorski, and Mr. Haederle sent Mr. Powell an email—in response to an email from Mr. Powell explaining the falsity of Haight's accusation—stating:

> Due to the seriousness of the two allegations, and the fact that HKS senior management has deemed the situation serious enough to formally put them in writing, the rest of the Executive Committee is in agreement that it would not be appropriate for you to continue your Council role at the moment.  The appropriate response is for you to suspend all your Council commitments (including your position as President) until HKS responds to your account. ...

> For you to continue in any role on the Council while these serious allegations are outstanding risks compromising the reputation of the Council.

55.     As a direct and proximate result of Defendants' false and defamatory statements and invasions of Mr. Powell's privacy, Mr. Powell lost his seat as President of the HKS DC Alumni Council.

56.     Defendants' false and defamatory statements and invasions of Mr. Powell's privacy have caused Mr. Powell to suffer embarrassment and humiliation.

**Mr. Powell And Defendants Enter Into A Tolling Agreement**

57.     On June 8, 2017, Mr. Powell and Defendants entered into a Statute of Limitations Tolling Agreement ("Tolling Agreement") whereby they agreed to toll the running of any applicable statutes of limitation relating to the claims in this Complaint during the period commencing on June 8, 2017 and ending on June 22, 2017 (the "Tolling Period").  Through the Tolling Agreement, the parties agreed that the Tolling Period is to be excluded from any calculation of time for the purpose of pleading or asserting any otherwise applicable statutes of limitation or repose, or other time bar, as a bar to this action and the claims in this Complaint and the action commenced by filing this Complaint.  As such, the claims below are all timely.

**COUNT ONE**
**DEFAMATION**
**(STATEMENTS ABOUT ACTIONS DURING MEETING WITH MS. NUNEZ)**
**(AGAINST ALL DEFENDANTS)**

58.     Mr. Powell repeats and re-alleges the allegations in Paragraphs 1-57 as if set forth fully herein.

59.     Defendants published false and defamatory statements of fact regarding Mr. Powell in the June 10, 2016 email from then-Senior Associate Dean for Alumni Relations and Resource Development Charles Haight to Sarah Wald, Wendy Pangburn, and Liz Nunez (the "June 10, 2016 Email").  The June 10, 2016 Email is attached hereto as Exhibit A.

60.     The June 10, 2016 Email contains the following false and defamatory statements of fact:

    (a)    Mr. Powell engaged in "inappropriate and unacceptable" "behavior" and "interactions with staff";

    (b)    Mr. Powell "berated" Ms. Nunez and "used threatening language towards [Ms. Nunez] in a closed room";

    (c)    Mr. Powell "treat[ed] staff disrespectfully"; and

    (d)    Mr. Powell acted in violation of "policies and standards of behavior at HKS."

61.     These statements of fact are of and concerning Mr. Powell.  In fact, the June 10, 2016 Email is addressed "Dear Steve," and refers to Mr. Powell by name and by his position as President of the HKS DC Alumni Council.

62.     These statements are reasonably understood to be statements of and concerning Mr. Powell and were in fact understood by persons reading them to be statements of and concerning Mr. Powell.

63.     These statements are reasonably understood to be statements of fact regarding Mr. Powell and were reasonably understood by persons reading them to be statements of fact regarding Mr. Powell.

64.     These statements are false.  Mr. Powell did not behave inappropriately, improperly, unprofessionally, or unacceptably.  Mr. Powell did not "berate[]" Ms. Nunez. Mr. Powell did not "use[] threatening language towards [Nunez] in a closed room."  Mr. Powell did not "treat[] staff disrespectfully."  Mr. Powell did not act in violation of "policies and standards of behavior at HKS."  To the contrary, Mr. Powell has always acted professionally and with composure, including during his meeting with Ms. Nunez, and despite Ms. Nunez's unprofessional behavior during that meeting.

65.     These statements are defamatory.   They accuse Mr. Powell of acting inappropriately, unprofessionally, and out of compliance with accepted norms of behavior. Indeed, the substantial danger of injury to Mr. Powell's reputation from these statements is readily apparent.  These statements would tend to hold Mr. Powell up to scorn, hatred, ridicule, or contempt in the minds of any considerable and respectable segment in the community.

66.     By publication of these statements, Defendants did hold Mr. Powell up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community.

67.     These statements are defamatory *per se* because they tend to subject, and have indeed subjected, Mr. Powell to hatred, distrust, ridicule, contempt, or disgrace, and because they may prejudice, and indeed have prejudiced, Mr. Powell in his profession or business, including by accusing Mr. Powell of conduct incompatible with his profession as a businessman and investment banker.

68.     Defendants' publication of these false and defamatory statements was negligent at a minimum.  Defendants never contacted Mr. Powell individually or inquired with him about the subjects or substance of his allegations before making them and did not allow Mr. Powell to dispute or explain why those accusations are false before Defendants published them to other persons.

69.     Defendants made these defamatory statements intentionally, willfully, maliciously, and in conscious disregard of Mr. Powell's rights and reputation and of the truth.

70.     Defendants had no applicable privilege or legal authorization to publish these false and defamatory statements or, if they did, they abused that privilege.

71.     In addition to injuries presumed by law, these defamatory falsehoods have injured—and will continue to injure—Mr. Powell in at least the following ways:

(a)     By impugning Mr. Powell's professional and personal reputations;

(b)     By ascribing to Mr. Powell conduct that would adversely affect his fitness for proper conduct as a businessman, investment banker, leader, and member of the HKS alumni community; and

(c)     By causing Mr. Powell damages in other ways yet to be determined.

72.     Defendants are liable to Mr. Powell for compensatory damages arising out of their defamation of Mr. Powell.

73.     Defendants are also liable to Mr. Powell for punitive damages because of the wanton and outrageous nature of their defamation.

**COUNT TWO**
**DEFAMATION**
**(STATEMENTS ABOUT MR. POWELL'S STATUS AS AN HKS GRADUATE)**
**(AGAINST ALL DEFENDANTS)**

74.     Mr. Powell repeats and re-alleges the allegations in Paragraphs 1-57 as if set forth fully herein.

75.     Defendants published false and defamatory statements of fact regarding Mr. Powell in the June 10, 2016 email from then-Senior Associate Dean for Alumni Relations and Resource Development Haight to Sarah Wald, Wendy Pangburn, and Liz Nunez (the "June 10, 2016 Email").  The June 10, 2016 Email is attached hereto as Exhibit A.

76.     The June 10, 2016 Email contains the following false and defamatory statements of fact:

(a)     Mr. Powell incurred and has "a significant outstanding debt from the 1994 academic year in the amount of $22k while you were enrolled in the mid-career MPA program"; and

(b)     Mr. Powell's "degree was not conferred due to this outstanding debt" and "as a matter of policy, [Mr. Powell] cannot be considered a graduate of Harvard Kennedy School until this is remedied."

77.     These statements of fact are of and concerning Mr. Powell.  In fact, the June 10, 2016 Email is addressed "Dear Steve," and refers to Mr. Powell by name and by his position as President of the HKS DC Alumni Council.

78.     These statements are reasonably understood to be statements of and concerning Mr. Powell and were in fact understood by persons reading them to be statements of and concerning Mr. Powell.

79.     These statements are reasonably understood to be statements of fact regarding Mr. Powell and were reasonably understood by persons reading them to be statements of fact regarding Mr. Powell.

80.     These statements are false.  Mr. Powell does not have "a significant outstanding debt from the 1994 academic year in the amount of $22k while [he was] enrolled in the mid-career MPA program," Mr. Powell successfully completed all requirements at HKS for his MPA degree, HKS did confer an MPA degree on Mr. Powell and Mr. Powell is a graduate of HKS.  In fact, Defendants have repeatedly recognized Mr. Powell as an HKS graduate for over two decades, including as recently as May 8, 2016.

81.     These statements are defamatory.  They accuse Mr. Powell of incurring and failing to pay back debt and falsely representing himself as an HKS graduate.  Indeed, the substantial danger of injury to Mr. Powell's reputation from these statements is readily apparent. These statements would tend to hold Mr. Powell up to scorn, hatred, ridicule, or contempt in the minds of any considerable and respectable segment in the community.

82.     By publication of these statements, Defendants did hold Mr. Powell up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community.

83.     These statements are defamatory *per se* because they tend to subject, and have indeed subjected, Mr. Powell to hatred, distrust, ridicule, contempt, or disgrace, and because they may prejudice, and indeed have prejudiced, Mr. Powell in his profession or business, including by accusing Mr. Powell of conduct incompatible with his profession as a businessman and investment banker.

84.     Defendants' publication of these false and defamatory statements was negligent at a minimum.  Defendants never contacted Mr. Powell individually or inquired with him about the subjects or substance of his allegations before making them and did not allow Mr. Powell to dispute or explain why those accusations are false before Defendants published them to other persons.

85.     Defendants made these defamatory statements intentionally, willfully, maliciously, and in conscious disregard of Mr. Powell's rights and reputation and of the truth.

86.     Defendants had no applicable privilege or legal authorization to publish these false and defamatory statements or, if they did, they abused that privilege.

87.     In addition to injuries presumed by law, these defamatory falsehoods have injured—and will continue to injure—Mr. Powell in at least the following ways:

    (a)     By impugning Mr. Powell's professional and personal reputations;

    (b)     By ascribing to Mr. Powell conduct that would adversely affect his fitness for proper conduct as a businessman, investment banker, leader, and member of the HKS alumni community; and

    (c)     By causing Mr. Powell damages in other ways yet to be determined.

88.     Defendants are liable to Mr. Powell for compensatory damages arising out of their defamation of Mr. Powell.

89.     Defendants are also liable to Mr. Powell for punitive damages because of the wanton and outrageous nature of their defamation.

**COUNT THREE**
**INVASION OF PRIVACY**
**(STATEMENTS RELEASING CONFIDENTIAL FINANCIAL INFORMATION)**
**(AGAINST ALL DEFENDANTS)**

90.     Mr. Powell repeats and re-alleges the allegations in Paragraphs 1-57 as if set forth fully herein.

91.     Defendants disclosed and disseminated confidential financial information about Mr. Powell without Mr. Powell's permission.

92.     Defendants improperly disclosed and disseminated confidential information about Mr. Powell's financial situation when Defendant Haight, acting in his capacity "[a]s a senior officer of HKS responsible for Alumni Relations," made statements allegedly disclosing Mr. Powell's tuition payments and purported graduate status in his June 10, 2016 email to Sarah Wald, Wendy Pangburn, and Liz Nunez (the "June 10, 2016 Email"), the contents of which Defendants also shared with other persons, including at least Jayme Johnson, Lisa-Joy Zgorski, and John Haederle.

93.     Defendants disclosed and disseminated confidential financial information about Mr. Powell without Mr. Powell's permission in the June 10, 2016 email from then-Senior Associate Dean for Alumni Relations and Resource Development Haight to Sarah Wald, Wendy Pangburn, and Liz Nunez (the "June 10, 2016 Email")—and when Defendants shared the information in that email with additional persons including, at the very least, Jayme Johnson, Lisa-Joy Zgorski, and John Haederle.  The June 10, 2016 Email is attached hereto as <u>Exhibit A</u>.

94.    The June 10, 2016 Email disclosed the following private, confidential, financial information:

    (a)    "[I]nformation that we [HKS] recently received from the Office of Financial Services [indicates] that you [Mr. Powell] have a significant amount of outstanding debt from the 1994 academic year in the amount of $22k while you were enrolled in the mid-career MPA program"; and

    (b)    "Their [Office of Financial Services] records indicate that your degree was not conferred due to this outstanding debt."

95.    This information was private.  It was of a highly personal or intimate nature.  Mr. Powell had an expectation of privacy in information surrounding his financial situation, because information related to one's financial status is highly personal and sensitive.

96.    Defendants published the facts to at least the following people: Ms. Nunez, Wendy Pangburn, Sarah Wald, Jayme Johnson, Lisa-Joy Zgorski, and John Haederle.

97.    Defendants did not have a privilege, legal authorization, or right to disclose or publish the information or, if they did, they abused that privilege, legal authorization, or right.

98.    No person to whom this information was disclosed had a legitimate concern in them.  The disclosure and invasion was both unreasonable and serious or substantial.

99.    Disclosing and publishing the facts caused Mr. Powell to suffer embarrassment, shame, and humiliation.   Disclosing and publishing such facts would cause suffering, embarrassment, shame, and humiliation in any person of ordinary sensibilities.

100.    Disclosing and publishing the facts caused Mr. Powell actual harm because they resulted in him losing his position as President of the HKS DC Alumni Council.

**COUNT FOUR**
**FALSE LIGHT**
**(STATEMENTS ABOUT ACTIONS DURING MEETING WITH MS. NUNEZ)**
**(AGAINST ALL DEFENDANTS)**

101.    Mr. Powell repeats and re-alleges the allegations in Paragraphs 1-111 as if set forth fully herein.

102.    Defendants published false statements of fact regarding Mr. Powell that placed Mr. Powell in a false light in the June 10, 2016 email from then-Senior Associate Dean for Alumni Relations and Resource Development Haight to Sarah Wald, Wendy Pangburn, and Liz Nunez (the "June 10, 2016 Email"). The June 10, 2016 Email is attached hereto as <u>Exhibit A</u>.

103.    The June 10, 2016 Email contains the following false statements of fact that placed Mr. Powell in a false light:

(a)    Mr. Powell engaged in "inappropriate and unacceptable" "behavior" and "interactions with staff";

(b)    Mr. Powell "berated" Ms. Nunez and "used threatening language towards [Ms. Nunez] in a closed room";

(c)    Mr. Powell "treat[ed] staff disrespectfully"; and

(d)    Mr. Powell acted in violation of "policies and standards of behavior at HKS."

104.    These statements of fact are of and concerning Mr. Powell. In fact, the June 10, 2016 Email is addressed "Dear Steve," and refers to Mr. Powell by name and by his position as President of the HKS DC Alumni Council.

105.    These statements are reasonably understood to be statements of and concerning Mr. Powell and were in fact understood by persons reading them to be statements of and concerning Mr. Powell.

106.     These statements are reasonably understood to be statements of fact regarding Mr. Powell and were reasonably understood by persons reading them to be statements of fact regarding Mr. Powell.

107.     These statements are false.   Mr. Powell did not behave inappropriately, improperly, unprofessionally, or unacceptably.   Mr. Powell did not "berate[]" Ms. Nunez. Mr. Powell did not "use[] threatening language towards [Nunez] in a closed room."   Mr. Powell did not "treat[] staff disrespectfully."   Mr. Powell did not act in violation of "policies and standards of behavior at HKS."   To the contrary, Mr. Powell has always acted professionally and with composure, including during his meeting with Ms. Nunez, and despite Ms. Nunez's unprofessional behavior during that meeting.

108.     These statements placed Mr. Powell in a false light that would be offensive to a reasonable person.   These statements placed Mr. Powell in a light that suggests he threatens colleagues during professional meetings, violates codes of conduct, and engages in other unprofessional and intimidating behavior in professional contexts.

109.     In addition to injuries presumed by law, these falsehoods have injured—and will continue to injure—Mr. Powell in at least the following ways:

      (a)     By impugning Mr. Powell's professional and personal reputations;

      (b)     By ascribing to Mr. Powell conduct that would adversely affect his fitness for proper conduct as a businessman, investment banker, leader, and member of the HKS alumni community; and

      (c)     By causing Mr. Powell damages in other ways yet to be determined.

110.     Defendants are liable to Mr. Powell for compensatory damages arising out of the false light in which they placed Mr. Powell.

111.     Defendants are also liable to Mr. Powell for punitive damages because of the wanton and outrageous nature of the false light in which they placed Mr. Powell.

**COUNT FIVE**
**FALSE LIGHT**
**(STATEMENTS ABOUT MR. POWELL'S STATUS AS AN HKS GRADUATE)**
**(AGAINST ALL DEFENDANTS)**

112.    Mr. Powell repeats and re-alleges the allegations in Paragraphs 1-57 as if set forth fully herein.

113.    Defendants published false statements of fact regarding Mr. Powell that placed Mr. Powell in a false light in the June 10, 2016 email from then-Senior Associate Dean for Alumni Relations and Resource Development Haight to Sarah Wald, Wendy Pangburn, and Liz Nunez (the "June 10, 2016 Email").  The June 10, 2016 Email is attached hereto as Exhibit A.

114.    The June 10, 2016 Email contains the following false statements of fact that placed Mr. Powell in a false light:

      (a)    Mr. Powell incurred and has "a significant outstanding debt from the 1994 academic year in the amount of $22k while you were enrolled in the mid-career MPA program"; and

      (b)    Mr. Powell's "degree was not conferred due to this outstanding debt" and "as a matter of policy, [Mr. Powell] cannot be considered a graduate of Harvard Kennedy School until this is remedied."

115.    These statements of fact are of and concerning Mr. Powell.  In fact, the June 10, 2016 Email is addressed "Dear Steve," and refers to Mr. Powell by name and by his position as President of the HKS DC Alumni Council.

116.    These statements are reasonably understood to be statements of and concerning Mr. Powell and were in fact understood by persons reading them to be statements of and concerning Mr. Powell.

117.    These statements are reasonably understood to be statements of fact regarding Mr. Powell and were reasonably understood by persons reading them to be statements of fact regarding Mr. Powell.

118.    These statements are false.  Mr. Powell does not have "a significant outstanding debt from the 1994 academic year in the amount of $22k while [he was] enrolled in the mid-career MPA program," Mr. Powell successfully completed all requirements at HKS for his MPA degree, HKS did confer an MPA degree on Mr. Powell and Mr. Powell is a graduate of HKS.  In fact, Defendants have repeatedly recognized Mr. Powell as an HKS graduate for over two decades, including as recently as May 8, 2016.

119.    These statements placed Mr. Powell in a false light that would be offensive to a reasonable person.  Defendants place Mr. Powell in a false light that suggests he has falsely and fraudulently claimed to be a graduate of HKS and that Mr. Powell incurs and does not repay debts.

120.    In addition to injuries presumed by law, these falsehoods have injured—and will continue to injure—Mr. Powell in at least the following ways:

    (a)    By impugning Mr. Powell's professional and personal reputations;

    (b)    By ascribing to Mr. Powell conduct that would adversely affect his fitness for proper conduct as a businessman, investment banker, leader, and member of the HKS alumni community; and

    (c)    By causing Mr. Powell damages in other ways yet to be determined.

121.    Defendants are liable to Mr. Powell for compensatory damages arising out of the false light in which they placed Mr. Powell.

122.    Defendants are also liable to Mr. Powell for punitive damages because of the wanton and outrageous nature of the false light in which they placed Mr. Powell.

**COUNT SIX**
**PROMISSORY ESTOPPEL**
**(AGAINST ALL DEFENDANTS)**

123.    Mr. Powell repeats and re-alleges the allegations in Paragraphs 1-57 as if set forth fully herein.

124.    Throughout the past twenty-three years since Mr. Powell graduated from HKS, Defendants have told and promised to Mr. Powell and represented, including publicly, both to Mr. Powell and others, that Mr. Powell was and is a graduate of HKS and that he was and is a member of the HKS alumni community.

125.    Defendants have done so by conferring an MPA degree from HKS on Mr. Powell in June 1994, by expressly telling Mr. Powell that he is a graduate of HKS and member of the HKS alumni community, and by including Mr. Powell in numerous alumni communications, and allowing Mr. Powell to be a member of and participate in HKS alumni organizations and events.

126.    Defendants' representations that Mr. Powell was and is a graduate of HKS and that he was and is a member of the HKS alumni community were intended to induce Mr. Powell to rely on the representations and to devote significant time and energy and to expend money on Defendants and their alumni organizations.

127.    A reasonable person would rely upon these representations and promises by Defendants.

128.    Mr. Powell did in fact reasonably rely—to his detriment—on the representations by Defendants.

129.    Over the past two decades, Mr. Powell has devoted significant time and energy, and expended substantial funds to HKS and the HKS alumni community, because he is a graduate of HKS, as repeatedly stated by Defendants.

130.    In the June 10, 2016 email from then-Senior Associate Dean for Alumni Relations and Resource Development Haight to Sarah Wald, Wendy Pangburn, and Liz Nunez (the "June 10, 2016 Email"), Defendants, for the first time in over two decades since Mr. Powell graduated

from HKS with his MPA degree, disputed Mr. Powell's status as a graduate of HKS.  The June 10, 2016 Email is attached hereto as Exhibit A.

131.    In the June 10, 2016 Email, Defendants asserted that "you [Mr. Powell] have a significant outstanding debt from the 1994 academic year in the amount of $22k while you were enrolled in the mid-career MPA program," that "your degree was not conferred due to this outstanding debt," and that "[t]his is problematic for the School, and as a matter of policy, you cannot be considered a graduate of Harvard Kennedy School until this is remedied."  These statements in the June 10, 2016 Email are false.  Mr. Powell's employer paid his tuition in full after he enrolled in HKS's MPA Program and Mr. Powell successfully completed all requirements for obtaining an MPA from HKS, graduated from HKS and received his MPA degree.

132.    It would be inequitable and unjust to allow Defendants to deny Mr. Powell the privileges that attend being a graduate of HKS and possessing a degree from HKS after representing to him for over twenty years that he is a graduate of HKS.

133.    Injustice can only be avoided by enforcing Defendants' promises to Mr. Powell that he is a graduate of HKS and member of the HKS alumni community and estopping Defendants from claiming that Mr. Powell is not a graduate of HKS or member of the HKS alumni community.

134.    Defendants must be estopped from claiming that Mr. Powell is not a graduate of HKS or member of the HKS alumni community.

## COUNT SEVEN
## EQUITABLE ESTOPPEL
## (AGAINST ALL DEFENDANTS)

135.    Mr. Powell repeats and re-alleges the allegations in Paragraphs 1-57 as if set forth fully herein.

136.    Throughout the past twenty-three years since Mr. Powell graduated from HKS, Defendants have told and promised to Mr. Powell and represented, including publicly, both to Mr. Powell and others, that Mr. Powell was and is a graduate of HKS and that he was and is a member of the HKS alumni community.

137.    Defendants have done so by conferring an MPA degree from HKS on Mr. Powell in June 1994, by expressly telling Mr. Powell that he is a graduate of HKS and member of the HKS alumni community, and by including Mr. Powell in numerous alumni communications, and allowing Mr. Powell to be members of and participate in HKS alumni organizations and events.

138.    Defendants' representations that Mr. Powell was and is a graduate of HKS and that he was and is a member of the HKS alumni community were intended to induce Mr. Powell to rely on the representations and to devote significant time and energy and to expend money on Defendants and their alumni organizations.

139.    A reasonable person would rely upon these representations and promises by Defendants.

140.    Mr. Powell did in fact reasonably rely—to his detriment—on the representations by Defendants.

141.    Over the past two decades, Mr. Powell has devoted significant time and energy, and expended substantial funds to HKS and the HKS alumni community, because he is a graduate of HKS, as repeatedly stated by Defendants.

142.    In the June 10, 2016 email from then-Senior Associate Dean for Alumni Relations and Resource Development Haight to Sarah Wald, Wendy Pangburn, and Liz Nunez (the "June 10, 2016 Email"), Defendants, for the first time in over two decades since Mr. Powell graduated

from HKS with his MPA degree, disputed Mr. Powell's status as a graduate of HKS.  The June

10, 2016 Email is attached hereto as Exhibit A.

143.    In the June 10, 2016 Email, Defendants asserted that "you [Mr. Powell] have a

significant outstanding debt from the 1994 academic year in the amount of $22k while you were

enrolled in the mid-career MPA program," that "your degree was not conferred due to this

outstanding debt," and that "[t]his is problematic for the School, and as a matter of policy, you

cannot be considered a graduate of Harvard Kennedy School until this is remedied."   These

statements in the June 10, 2016 Email are false.  Mr. Powell's employer paid his tuition in full

after  he  enrolled  in  HKS's  MPA  Program  and  Mr.  Powell  successfully  completed  all

requirements  for  obtaining  an  MPA  from  HKS,  graduated  from  HKS  and  received  his  MPA

degree.

144.    It would be inequitable to allow Defendants to deny Mr. Powell the privileges that

attend being a graduate of HKS and possessing a degree from HKS after representing to him for

over twenty years that he is a graduate of HKS.

145.    Defendants must be estopped from claiming that Mr. Powell is not a graduate of

HKS.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter an award and judgment

in his favor, and against all Defendants jointly and severally, as follows:

(a)     awarding Mr. Powell compensatory damages of not less than $750,000;

(b)     awarding Mr. Powell punitive damages of not less than $300,000;

(c)     estopping and preventing Defendants from disputing Mr. Powell's status
         as a graduate of HKS;

(d)     awarding Mr. Powell all expenses and costs, including attorneys' fees; and

(e)      such other and further relief as the Court deems appropriate.

## JURY DEMAND

146.    Plaintiff demands a trial by jury on all claims and issues so triable.


Date:   June 22, 2017                              <u>  /s/ Thomas A. Clare                    </u>
                                                   Thomas A. Clare (D.C. Bar No. 461964)
                                                   Elizabeth M. Locke (D.C. Bar No. 976552)
                                                   Joseph R. Oliveri (D.C. Bar No. 994029)
                                                   10 Prince Street
                                                   Alexandria, VA 22314
                                                   (202) 628-7400
                                                   tom@clarelocke.com
                                                   libby@clarelocke.com
                                                   joe@clarelocke.com

                                                   *Attorneys for Plaintiff Stephen Powell*